**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**ROCK HILL DIVISION**

File No.: 23-cv-00970-CMC

_____

| | | |
|---|---|---|
| **TOM HUTTO** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| | ) | U.S.C. § 1983 |
| v. | ) | (Jury Trial Demanded) |
| | ) | |
| | ) | |
| **CITY OF ROCK HILL**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

    **NOW COMES** Plaintiff, by and through the undersigned counsel, seeking damages, injunction, and declaratory judgment, pursuant to U.S.C. § 1983, and shows the following on to this Honorable Court:

<u>**INTRODUCTION**</u>

    1.  At the heart of this public-interest litigation is animus-motivated abuse of zoning power, designed to exclude a politically unpopular group from certain residential communities. The resulting ordinance is an irrational attempt to regulate what the city has no business of regulating in the first place - the homeowners' right to exclude others, which is regarded as the most valuable right in the "bundle of sticks" that comes with owning land, and its counterpart, i.e., the right to

1

host guests. The "land use" the city is attempting to regulate takes place entirely within a privately owned residential property. Moreover, the use itself is residential in nature and entirely undetectable from the outside. Lastly, while generally applicable existing law is plainly sufficient to protect the neighbors' quiet enjoyment from *real* interferences, the city enacted the regulations to protect certain distinguished members of the Rock Hill community from imaginary issues, such as "Mr. Marriott coming down to Rock Hill to purchase every house on Meadowbrook Lane in Seventeen Acres to convert them into Airbnbs" (sic). The legislative history makes it abundantly clear that the regulations were proposed in response to certain members of the community "pulling strings," and that it served as a vehicle to harm a politically unpopular group, Hosts.

2.   This public interest litigation will show that the City Council exceeded its power to legislate for the general welfare by enforcing **private biases** of some of its adamant supporters, including but not limited to Zack Zapack and Rick Lee, who are entirely unable to articulate any legally cognizable argument in support of their irrational disapproval of what the city labeled "short-term rentals" ("STRs"). The legislative record is not in dispute - there are no actual issues involving STRs and those who oppose STRs readily admit that the Hosts "are doing a great job."

3.   The government did not try to disguise what drove it to abuse its legislative power, repeatedly admitting on the record that the sole reason for enacting this unconstitutional piece of legislation was that "*they* do not want it here" in their upscale neighborhoods. Some councilmembers also freely expressed their own moral disapproval of STRs and desire to exclude Hosts and Guests from certain neighborhoods, which amounted to a legislative ill will.

4.   The ordinance at bar arbitrarily classifies Rock Hill residents into Hosts *versus* Neighbors and severely limits Hosts' right to have overnight guests, while leaving Neighbors' right to engage in the same exact activity untouched, despite the fact that the impact on the community is either

identical or frequently substantially more detrimental, when Neighbors have Guests, as compared to STRs, because Hosts are held to a higher standard. Not only does the amended ordinance limit Hosts' ability to have overnight guests, it gives the Neighbors an unprecedented veto power which can be exercised on a whim.

5.   As such, Plaintiff brings this public-interest action seeking damages as well as injunctive and declaratory relief,  pursuant to the Civil Rights Act, to restore the Rule of Law in the City of Rock Hill, on the grounds that the city's Amended Ordinance is based on unconstitutional animus in violation of Equal Protection of Law, arbitrary and capricious in violation of Substantive Due Process, unconstitutionally vague in violation of Procedural Due Process, unreasonably intrusive in violation of the Fourth Amendment, motivated by suppression of ideas in violation of the First Amendment, and unduly burdensome in violation of the Dormant Commerce Clause. Plaintiff is also seeking Declaratory Judgment that the Ordinance is both unconstitutional and partially preempted by the statutory state law, which allows vested rights to run with the land.

## HOSTING

6.   It is important to get the terminology straight. "Hosting" is not a rental activity. Despite the misconception, hosting is the essence of property rights - the right to exclude others and its counterpart, the right to grant another permission to enter upon one's land for a specified purpose.

7.   Hosting has been around for generations and long before online platforms such as Airbnb figured out a way to capitalize on it. The conceptual definition of hosting is simply having an overnight guest. One may not have realized it or called it "hosting," but when a college friend crashed on his or her sofa for a few nights back in 1985, hosting in its most pure and primitive form took place. While hosting did evolve over the years, becoming extremely popular in recent years largely due to the invention of hosting platforms, in its essence, it has not changed at all.

8.   Overnight stay means that the property is used as a dwelling, which is how the courts have always defined residential use. Neither the financial gain nor the use of hosting platforms transforms hosting into a commercial activity, even though hosting guests may well be one's business, because the use to which the property itself is put is controlling.

9.   Unlike a rental activity, however, which creates a leasehold estate and associated property rights, hosting is a creature of contract. To illustrate this crucial difference, it is helpful to compare an easement, which is a nonpossessory *property* interest, to a license, which is a mere *contractual* permission to enter one's land. From the legal standpoint, hosting is a mere license - a permission to enter one's private residential property and remain as a guest for a limited purpose of overnight stay and other incidental residential uses.

10. Hosting is commonly albeit erroneously referred to as "Airbnb," which is heavily stigmatized, as most fairly new land uses often are, out of irrational fear of the unfamiliar. This stigma or prejudice is at the forefront of this controversy, fueling spirited public debate. While it is not even fairly debatable that hosting is beneficial to the community, as the government expressly recognized in the purpose section of the regulations, those who oppose it focus on unpermitted Hosts, instead of focusing on the activity itself, which leads to class-based regulations unrelated to their express purpose of preventing undue commercialization.

11. Instead of *regulating* the activity, local officials declared a war on Hosts under a superficial pretense of regulating purely imaginary and highly speculative "secondary effects" of hosting, while enforcing Neighbors' private biases, prejudice, and moral disapproval of those who choose to have strangers as their guests in exchange for money, which is their prerogative as property owners and as member of a civilized society entitled to the freedom of ideas. Ironically, the regulations do nothing to stop unpermitted and otherwise problematic hosting, while arbitrarily

zoning away constitutional rights of Hosts who do play by the rules, simply because a few men of standing in the community are afraid of what *might* happen in the future.

## ZONING POWER

12. Since the Supreme Court gave zoning its constitutional stamp of approval in the 1926 case of *Village of Euclid v. Ambler Realty Co.,* zoning has soared in importance as a land use control device. *See Young v. American Mini Theatres, Inc*., 427 U.S. 50, 88 (1976) (Stewart, J., dissenting). All major cities in the United States, as well as smaller city and county governments have seized the opportunity to control their community's quality of life through local land use regulation. States uniformly have delegated to local government units, or in some cases to regional bodies, the police power to control land use in order to promote public health, safety, welfare, and morals.

13. However, as with any great power, comes abuse, manifesting itself as constitutional clashes involving Fifth Amendment, Equal Protection, and Due Process Clause. First Amendment rights have also suffered due to the nation's embrace of zoning as a vehicle of choice in the pursuit of America's dream community.

14. When abused, zoning power serves as a legalized device to prevent property owners from doing whatever their neighbors dislike, under a superficial pretext of protecting general welfare, while in reality promoting private biases and unarticulated fear at the expense of property rights and minority viewpoints. *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9 (1974). In light of this growing trend to zone away property owners' constitutional rights, state legislators "must do more than proffer the legislature's declaration that the uses [a landowner] desires are inconsistent with the public interest." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).

15. What is happening in Rock Hill is not in any way unique. It is a well-known and almost inevitable phenomenon that accompanies development and urbanization of our communities. Ever

since zoning power of the local governments became widely used, a fight between a land-owner advocating a new land use and his neighbors stubbornly resisting a change ensured.

16. A survey of constitutional zoning precedents reveals that early decisions to uphold the constitutionality of zoning were motivated, to a large extent, by the economic and quality-of-life advantages that inhere to the privileged class of single-family homeowners through their ability to obviate nuisance-like activities by controlling land use.

17. Justice Sutherland, who delivered *Euclid* decision, which opened up the floodgate of municipal use of zoning power, reasoned that "very often the apartment house is a mere parasite," and, "[in some environments,] apartment houses **...** come very near to being nuisances," revealing his aversion to those land uses that were unfamiliar and thus perceived as threatening to his concept of a traditional neighborhood. In all likelihood, it was Sutherland's anticipation of nuisances from these "parasites" that motivated him to depart from his conservative stance against legislative activity. *See, e.g., Adkins v. Children's Hosp.*, 261 U.S. 525, 560-61 (1923), *overruled by West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937).

18. What these early decisions demonstrate is that certain members of our communities will always be resistant to change out of their irrational fear and prejudice towards new and unfamiliar land uses. Our communities, however, continue to evolve. So does the law, recognizing that "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

19. The same exact controversy, which first presented itself for judicial review in *Euclid*, is before this Honorable Court, only this time, Neighbors' irrational opposition concerns what the city labeled "short-term rentals" ("STRs"). What sets this case apart is clear evidence of illegitimate animus.

**ANIMUS**

20. At the heart of the spirited public debate that ensured upon the city's sudden unprovoked decision to tighten its STRs regulations is an Equal Protection doctrine of illegitimate animus, which invalidates laws based on privately held bias towards a particular social group, singled out for differential treatment under a pretext of legitimate state interests.

21. The Supreme Court's animus jurisprudence is limited and not entirely coherent, however, there are important common threads that run through the fabric of constitutional law as reflected in the handful of seminal cases, such as *Moreno*, *Palmore*, *Cleburne, Romer, Plyler, Perry* and *Lawrence*. What these cases illustrate is that animus comes in many forms: desire to harm a politically unpopular group (*Moreno*), private bias (*Palmore*), moral disapproval (*Lawrence*), as well as a fear, stereotype or unarticulated dislike (*Cleburne*). All of these various forms of unconstitutional animus are implicated here.

22. These cases share one crucial commonality. In each of the above referenced cases, state or private actors explicitly expressed hostility toward a **particular social group**, and this unarticulated dislike was the driving force behind the resulting state action. Animus is present where the public laws are harnessed to create and enforce distinctions between social groups - that is, groups of persons identified by status rather than conduct. Laws that perform this function express an ideology of social group supremacy - something the Constitution does not permit. As will be discussed below, the regulations at bar express and enforce distinctions between the following social castes: Hosts, Guests, and Neighbors.

23. The Court has held that where a law is based on such animus, it will not survive even the most deferential level of scrutiny under the Equal Protection Clause. *See Romer v. Evans*, 517 U.S. 620 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); *Palmore v. Sidoti*, 466

U.S. 429 (1984); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 1002 (N.D. Cal. 2010). Commitment of Equal Protection to fundamental anti-caste orientation applies with equal concern to all discrimination against social groups, regardless of whether they have been recognized as suspect classifications.

24. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Department of Agriculture v. Moreno*, 413 U.S. at 534. The majority in *Moreno* emphasized that the Equal Protection Clause abhors classifications undertaken for their own sake, i.e., classifications undertaken for the sake of excluding some from benefits but not others, without some affirmative justification for doing so. *Id*. Laws could not and should not express bare moral disapproval of otherwise innocuous conduct and bare moral disapproval of groups associated with that conduct. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

25. What is even more important is that the fact that such biases and disapproval are widely, dearly, and sincerely held does not save the law from being offensive to the Constitution. *See Lawrence v. Texas*, 539 U.S. 558, 574 (2003). The sincerity of Neighbors' animus is entirely irrelevant to the analysis. The real problem with the law based on animus is that it targets a particular social group, i.e., Hosts, *alone* for conduct, such as hosting overnight guests, in which others, i.e., Neighbors, are permitted to engage.

26. As will be shown below, the Ordinance before the Honorable Court embodies elements of punitiveness and discrimination in violation of Hosts' entitlement to equal treatment under the law, by giving effect to Neighbors' private biases and prejudice. The legislative history makes it abundantly clear that the City Council's decision to first enact and subsequently amend its STR

regulations was motivated by precisely these impermissible purposes, designed to punish Hosts as a politically unpopular group.

## JURISDICTION AND VENUE

27. Plaintiff brings this action against Defendant for deprivation of Equal Protection, Due Process, and Dormant Commerce Clause rights, seeking damages pursuant to 42 U.S.C. § 1983 under the Civil Rights Act of 1871. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331.

28. Plaintiff also brings state law claims based on a common nucleus of operative facts as the underlying federal claims and arising out of the same series of transactions or occurrences as the civil rights claims. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

29. This Honorable Court has both general personal jurisdiction over Defendant based on its domicile at the time this Complaint was filed, which is the state of its incorporation, and specific personal jurisdiction as the acts prohibited by Civil Rights Act as well as events giving rise to the claims occurred in this District.

30. Venue is proper in this district because Defendant is a resident of this District and acts proscribed by 42 U.S.C. § 1983, which gave rise to Plaintiff's claims, occurred in this District.

## PARTIES

31. Tom Hutto (hereinafter "Plaintiff") is a citizen of the United States and a resident of Rock Hill, South Carolina.

32. Plaintiff first came to Rock Hill back in 1985 to attend Winthrop University, where he wrestled on the first and only Winthrop Eagles Squad. Enticed by the small-town charm, which Rock Hill had in abundance, he decided to stay and build his life here. Plaintiff served as a local

wrestling referee for over 20 years, and coached a youth wrestling club in Indian Land. Plaintiff is a family man – he is a loving husband and a proud father. He met his wife, who is a talented chef by trade, here and all three of his beautiful daughters were born in Rock Hill, at home with the help of a local midwife. Plaintiff's family enjoys going to the beach as well as the mountains, sailing, swimming, and solving cross-word puzzles.

33. Plaintiff's family attends Westminster Presbyterian Church and he is involved with the community in a meaningful way. For instance, Plaintiff hosts Afghan families of refugees, along with his multiple local church partners.

34. Plaintiff first got into rental business back in 1997. He began hosting his first property in 2018 and he secured his first STR permit in November of 2020. Plaintiff currently owns and hosts 12 properties in Rock Hill. Plaintiff invested over $240,000 in renovations and furnishings alone, not to mention the purchase price of the real estate itself. This is a family operation and he relies on hosting as his family's main source of livelihood. Plaintiff handles renovations and maintenance, while his wife, who is a superhost, handles guest relations and schedules housekeeping. Plaintiff and his wife are true partners in life and business. Plaintiff's daughters assist with cleaning the properties.

35. Plaintiff's hosting operation benefits the community by creating jobs. Plaintiff hires locals to assist with his hosting operation. He also welcomes out-of-state travelers to Rock Hill, which in turn helps local businesses as Guests spend money locally.

36. Plaintiff is a Host and a real party in interest to the extent that he has a personal stake in the subject matter of the lawsuit. Plaintiff's hosting activities are directly affected by the Ordinance at issue, both the original one and as amended in 2022, to the extent the Ordinance zoned away Plaintiff's constitutional rights as well as his vested property rights, resulting in injury, which (1)

is concrete and not hypothetical, (2) caused by the City's enactment of STR regulations, and (3) could be redressed by an award of damages, injunction, and declaratory judgment.

37. The controversy is real and substantial; it is not contingent, abstract, or hypothetical. Plaintiff's injury stems directly from the enactment of both 2020 Ordinance as well as 2022 Amended Ordinance, which gave effect to Neighbors' private biases and moral disapproval by (1) vesting the HOAs and Neighbors with entirely arbitrary power to veto Hosts' lawful land use because they "do not want it here," in violation of Equal Protection and Due Process, (2) vesting the Planning Director with unfettered discretion, incorporating excessively vague provisions, and utilizing unlawful moratorium to amend the Ordinance in violation of Hosts' Procedural Due Process, (3) infringing on Plaintiff's freedom of ideas and right to privacy guaranteed by the First and Fourth Amendments, and (4) placing an undue burden on interstate commerce in violation of the Dormant Commerce Clause. The Ordinance also abrogated Plaintiff's vested property rights in violation of state statutory and common law.

38. Municipality of Rock Hill (hereinafter "Defendant" or "City" or "City Council" or "Municipality") is a political and governmental subdivision responsible for the City's land use decisions. Defendant is a municipal corporation formed under S.C. Code §§ 5-13-10—5-13-100. It is operated under the Council-Manager form of government. City Council serves as the legislative authority. The City Council determines all municipal policies, adopts ordinances, and appoints the City Manager, the chief administrative officer for the City. The Council is the governing body of the City; the City Manager is its agent in carrying out the policies established by Council. The City Council is comprised of Mayor John Gettys and six (6) councilmembers: Derrick Lindsay, Kathy Pender, Kevin Sutton, John Black, Perry Sutton, and Jim Reno.

39. Mayor Gettys began serving as a councilmember in 2002 and he was subsequently reelected in 2005. Mayor Gettys is an active founding partner of Morton Gettys, one of the largest and most reputable law firms in Rock Hill. Morton Gettys routinely represents clients in municipal matters. Mayor Gettys appears to be one of the few councilmembers who fully comply with the statutory requirement to publicly disclose income by filing an annual Statement of Economic Interest ("SEI").

40. It is unclear when Derrick Lindsay first began serving as a member of the City Council, however according to the City's website, he "has served the community for the past 20 years, by operating Showmars Restaurant. He did file an SEI in 2019-2021.

41. Kathy Pender has served on the City Council since 2004. The City's website did not provide any additional background information on Councilmember Pender. She has no personal income reported for herself or any immediate family member on her SEI for 2018-2021. It does not appear that she is employed and her husband is retired. Councilmember Pender does not disclose any retirement funds either.

42. Kevin Sutton, a member of the Court Review Board, is currently serving his seventh term. According to the City's website, "he has been serving on the Council since he was 23." It is unclear what he does for a living, however some online sources suggest that he is employed as a national accounts manager at Arauco. He pays $1,046.73 in property taxes annually. Councilmember Sutton failed to file his SEI in 2019-2021.

43. It is unclear when John Black was first elected, however, according to the City's website, he "has taken his lifelong passion for Rock Hill to the City Council, representing Ward 4." He did file his SEI for 2018-2021, disclosing income made as a financial advisor as well as his wife's income.

44. Perry Sutton appears to be the newest member of the City Council, whose service commenced in 2022, while he was attending Winthrop University. He filed a SEI for 2021, however it did not list any income for him or his wife.

45. Jim Reno, who earned a Juris Doctor in 1988, is currently serving his sixth term on the City Council. He worked at PNC Financial Services from 2018 to 2021, when he became employed with the First Citizens Bank. Even though he filed a SEI for 2018-2021, he only disclosed his government salary. Councilmember Reno also failed to disclose his wife's income.

46. Spencer & Spencer, PA, serves as a city attorney.

## BACKGROUND FACTS

47. This controversy dates back to 2017, when the Municipality first attempted to regulate hosting. On February 13, 2017, the City Council sponsored a petition to amend the municipal code to allow STRs for only 14 days of any given calendar year.

48. The City's proposed regulations described STRs as follows: "Short-term rentals are where a property owner (or tenant) rents their home or apartment to others (generally *strangers*) for a short period of time, such as a weekend or a week," which is "usually arranged through a website, many times without the host and guest even meeting in person."

49. The legislative history shows that the City's action was prompted by a *single* complaint from a *single* property owner.

50. This was the first time the City attempted to purposefully violate Hosts' vested property rights and investment backed expectations, as the Municipality knew that Hosts were actively engaged in operating STRs and had bookings and should have known that it could not ban nonconforming land use, which predated the enactment of its regulations.

13

51. The Municipality's application and supporting documentation, consisting of a single email from a resident of Rock Hill and Planning Director's response, refer to STRs as an "issue," however fail to articulate what makes STRs an "issue" and "short-term people" – "troublesome."

52. These proposed regulations were unanimously rejected by the Planning Commission on March 7, 2017. While the City adopted the Planning Commission's recommendation this time around, certain councilmembers dissatisfied with such outcome subsequently began appearing at the Zoning Board of Appeals ("ZBA") hearings, publicly voicing their disapproval of STRs, in violation of both state and local law.

53. Such conduct runs afoul of the separation of powers principle and amounts to a legislative veto, designed to control the administrative agency such as ZBA, to which the City Council delegated decision-making power.

54. On November 16, 2021, following the enactment of the first Ordinance as discussed below, councilmember Kevin Sutton appeared at the ZBA hearing commenting as follows:

> short-term rentals had not originally been allowed in the City at all, but that regulations had been put into place. While many neighborhoods had an HOA with covenants and restrictions with respect to allowing short-term rentals, many of the older neighborhoods did not have these types of regulations or an HOA to act on their behalf, so this was why the Zoning Board of Appeals was tasked with acting in this role. Long-term renters were more likely *known* by their neighbors, whereas with an Airbnb the tenant is *not known*.

55. "Councilmember Sutton also cited sections of the short-term rental regulations whereas the City meant to protect the residential character of neighborhoods and to prevent the commercialization of neighborhoods," in an attempt to unduly influence the ZBA's decision-making process, displaying his dissatisfaction with the ZBA and hostility towards STR use because Hosts choose to have strangers as guests in exchange for money.

56. The ZBA minutes clearly reflect irrational anti-STR sentiment held by some residents of the Rock Hill community:

> She stated having short-term renters coming in and out of the area would be disturbing to the residents, adding that headlights would shine into their windows. She expressed concern that larger gatherings would occur at the house with recreational use of alcohol.

### 2020 REGULATIONS

57. In 2020, the City Council decided to revisit the subject of STRs. On February 24, 2020, the City Council had the first reading of its second application to enact proposed STR regulations, erroneously commenting that "Short-term rentals such as AirBNB, HomeAway, or VRBO-Vacation Rentals by Owner, *have always been prohibited* in the City Code [and] [a]ny tenancy of 30 or fewer days is considered a hotel/motel use and is not allowed to occur in a residence" because (1) it is an error to equate a STR to a hotel, and (2) the Municipality did not prohibit STRs; it simply did not regulate STRs. These errors suggest fundamental misapprehension of hosting and STRs alike, and serve as evidence of the legislative ill will.

58. In the purpose Section 11-362 of the Ordinance, the Municipality made certain factual findings. First, it found that STRs "can be beneficial to the public if potential negative impacts are managed." The City further found that STRs "provide a means of assisting property owners with keeping properties in good order and repair, which in turn, assists in stabilizing home ownership, and maintaining property values in neighborhoods." In addition, the City found that STRs "also serve to bolster the City's sports tourism industry by providing alternatives to traditional hotels and motels for the traveling public," thereby acknowledging that the regulations impact out-of-state Guests and their right to interstate travel.

59. The Purpose Section of the Ordinance, including the City Council's express findings, was not amended in 2022 and presently remains the same as originally enacted in 2020.

60. The City's expressly stated purpose for enacting the STR regulations was prevention of "undue commercialization and disruption to the primary and overarching purpose of a neighborhood being first and foremost a residential community, where people actually live…"

61. Ironically, the Ordinance defined STR as a "rental of a *residentially-used* property in whole or in part for an overnight stay," making the City's stated purpose appear pretextual on its face. The Ordinance failed to explain how a STR use defined by the City Council as residential can possibly lead to commercialization.

62. The Ordinance required Hosts to obtain and maintain a business license and comply with revenue collection laws of the City of Rock Hill, York County, and the State of South Carolina. This requirement led the opponents of STRs to conclude that STRs constituted a commercial activity, despite the fact that the Ordinance expressly defined STR use as residential. In addition, the Ordinance required Hosts to recertify lack of restrictive covenants prohibiting STRs at the time of the renewal, contrary to the Hosts' vested property rights, both statutory and common law.

63. The City held a workshop designed to foster compromise between opposing parties and many Hosts, including Plaintiff, gladly participated in it, which led to the proposed regulations as a product of joint effort. However, the Ordinance signed into law on October 12, 2020 differed significantly from the proposed regulations, discussed at the workshop and the first reading. The Planning Director explained that staff revised the proposal "[b]ased on feedback from City Council during first reading of the proposed short-term rental regulations in February 2020," in violation of both local municipal law Sec. 2-49(a), which states that "neither the council nor its members shall deal with city officers and employees who are subject to the direction and supervision of the manager except through the manager, and neither the council nor its members shall give orders to

16

any such officer or employee, either publicly or privately," and similar state law as codified under S.C. Code § 5-7-180.

64. The revised regulations required all Hosts who applied for a permit after December 31, 2020, to seek "a special exception for the use from the Zoning Board of Appeals in order to allow the neighbors and HOAs to provide their input," irrespective of when the STR use commenced, while those who applied prior to December 31, 2020, would receive a staff-level review.

65. The Ordinance also required Hosts to (1) obtain the HOA's written consent to operate a STR irrespective of the restrictive covenants, (2) reside within a 15-mile radius from the hosted property per the Council's request given directly to the Planning Director, (3) keep a guest registry "in case the police needed to track down the guests for some reason" as explained by the Planning Director, (4) acquire a business license "as a hotel use" and pay 3% local accommodations tax, (5) not market or use the property as a "party house" or a "destination location" without defining either term, and (6) reapply annually and secure the HOA's permission each time the host renews the permit "to ensure the HOA has not changed its stance on the issue," per the Planning Director.

66. The Ordinance specified that the City would also reach out to the HOAs upon receiving an application to verify that the HOA "does not regulate or has approved" the STR, and provided the HOAs with ten (10) days to respond "to make sure it could not just filibuster."

67. Sec. 11-32 of the Municipal Code defines "business" as "any business, calling, occupation, profession, or *activity* engaged in with the object of *gain, benefit, or advantage, either directly or indirectly*." This definition is broad enough to cover overnight visits of family members and friends, irrespective of who engages in these activities, Hosts or Neighbors, as these activities are always undertaken with an object of *some* gain, such as affection, promotion, companionship, etc.

Notably, the Code does not require either the use of hosting platforms, nor payment of money, in order for an activity, such as hosting or STR, to constitute a business.

68. Moreover, the Ordinance contained a so-called "three-strikes rule," which allowed the Municipality to revoke a permit upon "three *valid* neighbor complaints or police calls" or a single event with "widespread community impacts," without defining what constituted a "valid" complaint or a "widespread community impact," because the City wanted to leave this section "open-ended to make sure we do not miss anything."

69. In addition, the Ordinance gave the Planning Director unfettered discretion to (1) reinstate a permit if she has "reason to believe that the issue … has been resolved," (2) "undertake the process to revoke the associated business license such that the host may not operate rentals on other properties either," if a STR permit was denied, and (3) "refuse to issue a rental permit to any host who has had a rental permit revoked, even if for a different property than the one for which the short-term rental permit is being requested."

70. Mr. Larry Schindel, who spoke at the second reading as a president of an HOA, expressed a concern that the HOA's "approval" requirement was a poor choice of words because "HOAs are bound by the restrictive covenants" in place and lack general power to approve or otherwise regulate land use, demonstrating that even those who usually opposed STRs had concerns that this arbitrary approval power was contrary to well-settled law, and that it could be easily abused and exercised on a whim.

71. Councilmember Pender commented that they had a lot of input from the neighborhoods "who were quite surprised that they had STRs in their communities," indicating that this was the reason the regulations were amended following the first reading in order to allow neighborhoods

a greater opportunity to voice their opposition to a STR. Her comment shows, however, STRs had no negative impacts on the neighborhoods.

72. The Planning Director commented on the 10-day period afforded to the HOAs to respond to the City's inquiry, explaining that once an HOA contacted the City, objecting to a STR, the HOA would be added to her "list and if anyone applies from that neighborhood in the future, the permit will be automatically denied" without going to the ZBA. By vesting the HOAs with this power to regulate, the City essentially delegated its decision-making authority to the HOAs.

## MORATORIUM

73. Following the enactment of the original STR Ordinance, there were no complaints involving STRs and Hosts were fully compliant with each of the requirements.

74. On January 18, 2022, councilmember K. Sutton appeared at the ZBA hearing with the goal of unduly influencing the proceedings. Several STR permits were before the ZBA. Councilmember Sutton observed the ZBA approve a STR permit application in Seventeen Acres, despite the Neighbors' opposition.

75. Disappointed with this outcome, Councilmember K. Sutton made it clear what the Council expected the ZBA to do and gave the ZBA an express directive to reject an application whenever there was any neighborhood opposition, displaying his personal aversion towards STRs by indicating that "he doesn't know anyone who wants to buy a house next to a short-term rental." He proceeded to inform the ZBA that he was contacted by some Neighbors who were in opposition to the permit application, advocating on their behalf. Lastly, Councilmember Sutton violated state and local law by urging the ZBA not to "approve short-term rentals when adjoining neighbors are adamantly opposed," fully aware that the City Council appointed the members to serve on the ZBA. Predictably, the ZBA complied with his order and rejected the application.

76. This single instance of the ZBA acting contrary to the City's expectations to the extent it granted a permit despite neighborhood opposition, yet in accordance with state law, which mandates strict construction of restrictive covenants, prompted the City to abuse its moratorium power in order to advance unilateral expectations of certain residents of Seventeen Acres.

77. On February 14, 2022, the City Council enacted a six-month Moratorium suspending the 2020 STR Ordinance, in violation of § 6-1-110, which states that "[n]o moratorium may be imposed without at least two readings which are a week apart." Although § 5-23-40 grants to each municipal corporation the power to provide for the manner in which zoning regulations "shall be determined, established and enforced and from time to time amended, supplemented or changed," and § 5-23-50 authorizes zoning regulations "from time to time [to] be amended, supplemented, changed, modified, or repealed," nothing in these two sections or in any other statute grants a municipal corporation the power to suspend an ordinance. Lastly, the Municipality violated § 31-3 of its own Municipal Code, which states "[t]he zoning ordinance may be amended only in the manner permitted and allowed by state law, after published notice and public hearing as required thereby."

78. The Moratorium put all of the permitted Hosts out of business without notice and an opportunity to comment, contrary to both state law and Federal Constitution, by specifically prohibiting Hosts from renewing their permits, in addition to not allowing any new Hosts to submit their applications.

79. Despite the fact that the Municipality subsequently changed its mind allowing Hosts to renew their permits, its willful actions constituted a taking without just compensation, albeit temporary. The Municipality also put prospective Hosts who made substantial investments out of business before they were able to secure a permit.

80. City attorney Paul Dillingham advocated in favor of the Moratorium, indicating that it was put in place in response to the "Council of Neighborhoods letter of concern," to enable the City to "pause and look at the issue to determine the course of action." He, however, neglected to explain what the issue was. In fact, the City repeatedly admitted that there were no complaints and that the Hosts "played by the rules."

81. Councilmember Reno spoke in favor of the moratorium emphasizing the "complexity" of STR use, however, neither the original Ordinance nor the amended one addressed many possible hosting arrangements, such as owner-occupied versus non-owner-occupied, the entire house or accessory structure, etc., intentionally ignoring apparent complexity of hosting.

82. On March 28, 2022, the Municipality amended its moratorium ordinance to allow renewals of the permits "if there were no complaints." The Planning Director noted that none of the Hosts had any complaints and this was just a "caveat in case something happened." This "caveat," however, was in conflict with the three-strikes rule as it suggested that a single complaint could be sufficient to deny a Host's application to renew.

83. On April 5, 2021, the Planning Commission held a public hearing on a "proposed pending" six-month moratorium on STRs, learning for the first time that the moratorium "was *in effect* after City Council passed the pending ordinance," according to the Planning Director, who explained that this was an "*unusual* procedure they used a few times to avoid the rush of permit applications submitted prior to the second reading by the Council."

84. This "unusual" procedure allowed the City to bypass the required public hearing procedure for enacting new ordinances, designed to give interested parties notice of the upcoming changes to the law and an opportunity to comment or otherwise act before the proposed changes become effective, in accordance with the Due Process clause.

85. This procedure was specifically designed to prevent prospective Hosts who have already invested in STRs an opportunity to secure a permit prior to the moratorium becoming effective as no one knew of the moratorium until it was already "in effect," in violation of their investment backed expectations.

86. When asked what prompted the moratorium since there were no complaints, the Planning Director indicated that the City was dissatisfied with the "approval process by the ZBA" which was "approving applications in spite of neighborhood opposition in non-HOA type of situations." She further expanded on the City's reasoning indicating that "the way the Ordinance is written right now, if there is an HOA, the City abides by the HOA's interpretation of the restrictive covenants to prohibit STRs, and a permit application does not even go to the ZBA, but when there is no HOA, the application goes to the ZBA, and the ZBA interprets 50-60 years old deed restrictions, which could be interpreted either way" in favor of the unrestricted land use, revealing that the Municipality enacted a moratorium out of frustration that the ZBA was acting in accordance with state law. This was an illegal and unethical effort to control the ZBA's decision-making as a quasi-judicial body, in violation of separation of powers principle.

87. The Planning Director further elaborated that the problem was that "there is no HOA to enforce the deed restrictions which is not something we contemplated at the time the ordinance was drafted," referring to the permit approved in Seventeen Acres. She further stated that the Municipality's "intent was that if there was *any* opposition to the permit application from the Neighbors, then the ZBA would not approve the application." She concluded that "this led the City Council to question whether the ZBA "was the right body to hear those requests."

88. The Planning Director indicated to the Planning Commission that the moratorium would "expire six (6) months after the second reading by the city" on April 25, 2022, however since the

moratorium was "in effect" upon signing, the duration of the moratorium was in fact nine (9) months, and not six (6) as the Municipality asserted.

89. Zack Zapack, who resides in Seventeen Acres, spoke at the hearing indicating "imagine a street with ten houses on it, all of which are STRs, which is permitted under the current regulations." He also stated that "STRs, bed-and-breakfast, and hotels, are the same thing." Mr. Zapack argued that "Airbnb is definitely a commercial enterprise" equating the platform itself with the use to which the property is put in support of his patently flawed logic that "if you are hiring landscapers and housekeepers, you are running a business, which becomes an issue in a neighborhood that has covenants specifying residential use only." He also argued that the ordinance must be amended to avoid "forcing them to go to court because of the ZBA's decision." Mr. Zapack concluded his speech by calling on everyone present "to challenge ourselves to develop a national model ordinance on STRs."

90. Retired Judge Woods, also a resident of Seventeen Acres, commented on the moratorium indicating that the problem with the ordinance as written is that "it has legal holes in it." He argued that the ZBA improperly issued a permit to one of his neighbors because his deed restrictions stated "residential use only and no mercantile or business activity." He then argued that since a STR required a business license, the use was commercial in nature. This argument is at odds with the Municipality's own definition of STRs as "rental use of a *residentially* used property for overnight stay." He concluded his speech stating "I am not here to ask for a permit to be revoked, but it says it here that a permit can be revoked for a false statement … the moratorium is necessary to clean it up."

91. Rick Lee, who also resides in Seventeen Acres, spoke in support of the moratorium indicating that Plaintiff was "doing a fine job" and that he was "a respected member of the

community, but we do not know who is going to convert properties moving forward in the future … most of the time the laws are not written for [Plaintiff] but for those who come along to abuse them," exhibiting animus towards the outsiders of the Rock Hill community. He also opined that the ZBA approval process failed because "restrictive covenants were not properly vetted and the only hope we have is that whoever comes along does so poorly that they have three neighbor complaints and get kicked off the platform." Mr. Lee emphasized "we have heard and we know that STRs are a commercial activity," in support of his lay opinion that STRs "should not be allowed in a zoning classification that does not permit commercial activity."

92. The Planning Director also indicated that the Municipality planned to have the first reading of the moratorium ordinance on April 25, 2022, however, it did not take place until May 9, 2022, when Mayor Gettys explained that the reason for enacting a "pending" ordinance in violation of state and local law was to "prevent financial loss" to people who invest in properties hoping to engage in STR use.

93. Upon information and belief, there was no second reading of the moratorium ordinance.

## WORKSHOP

94. On August 1, 2022, the Planning Director held a workshop with the Hosts to discuss proposed amendments of the STR regulations. She opened the meeting by indicating that the moratorium was put in place because the City was dissatisfied with how the ZBA was handling permit applications and that the purpose of the amendments was to put the "Council back in charge." Because by enacting a moratorium the Municipality's attempted to control the ZBA, its actions constituted a legislative veto in violation of the separation of powers limitation on legislative power.

24

95. The Planning Director also stated that the Municipality was considering limiting STRs to commercially zoned properties, putting a cap on the total number of STRs, requiring a certain amount of separation between STRs, having an attorney certify that the covenants permit STR use, and requiring inspections of the STRs. She, however, neglected to mention neighbors' consent requirement.

96. The Council of Neighborhoods did not participate in the workshop even though their letter of concern prompted the moratorium, according to the city attorney.

97. Mr. Zapack appeared and spoke in opposition to STRs, arguing that STR use is a commercial activity because the City requires a business license and that as such, STRs should not be allowed in residential neighborhoods. He also provided his lay opinion that STRs negatively impact property values in Seventeen Acres, which is at odds with the Municipality's express finding to the contrary that STRs help maintain property values. Mr. Zapack argued that there needed to be a mechanism in place to bypass the courts by making the Council the final decision maker. He proudly admitted that he was the moving force behind the enactment of the STR regulations in the first place, indicating that "City reacted quickly to the party house behind him, which is why the City has short-term rental regulations."

98. While the overwhelming majority of those who commented on the proposed amendments were in favor of STRs, a few residents spoke in opposition to STRs arguing that they have a "right to have an enjoyable person next-door" and "to have the same person next-door," which are not cognizable property rights. *See Horne v. Mayor of Baltimore*, 349 Fed. Appx. 835, 837 (4th Cir.2009) (noting "property interests may take many forms," but "to possess a protected property interest, one must have more than an abstract need or desire for it or a unilateral expectation of it, and must, instead, have a legitimate claim of entitlement to it.").

99. However, even the opponents of STRs admitted that there were no real issues involving permitted STRs, that the Hosts "were doing a great job," and that the Neighbors were not disturbed in their quiet enjoyment. The record squarely establishes that those who oppose STRs are unable to articulate a legally cognizable theory in support of their opposition, besides irrational fear and moral disapproval, as demonstrated by the following comments included in the Planning Director's post-workshop summary:

> "Short Term Rentals would impact quiet enjoyment of neighborhood **if** 9 of 10 houses on a street are STR's. That **could** happen under current regulations."

> "[Rick Lee] stated that while things are going well now, we don't know who will come along in the future and **may** abuse opportunity to operate."

100. This workshop differed significantly from the one held prior to the adoption of the initial STR regulations, to the extent that none of the proposed amendments were actually discussed. They were briefly referenced at the beginning of the meeting by the Planning Director, who then turned it over to the audience to state their general position on STRs, which suggested that the Municipality was not interested in *regulating* STRs, but planned to simply ban STRs in certain neighborhoods, such as Seventeen Acres.

## PROPOSED AMENDMENTS

101. Following the workshop, the first set of proposed amendments was distributed to the Hosts and those interested in STRs right before the Labor Day weekend, with the public hearing scheduled the day after the holiday, affording little opportunity to review and analyze the proposed regulations before the hearing.

102. The Planning Commission considered the first set of proposed amendments on September 6, 2022, characterizing them as heavy-handed and designed to "get rid of some STRs."

103.    The proposed amendments left the purpose section unmodified, including the Municipality's express goal to prevent undue commercialization and its express factual findings that STRs benefit the community in a variety of ways.

104.    In an effort to make its express purpose sound more conceivable and less irrational, the Municipality eliminated "residentially-used" from its definition of STRs, however, the use to which the property was put was still defined as "*an overnight stay* of less than 30 days at a time to one or more guest parties."

105.    The Municipality also proposed to cap STRs at 150 at any given time because it was "a number that looked good," according to the Planning Director. Moreover, each Host was limited to 15 permits. The proposed amendments also required a 1,500-foot separation between STRs, which essentially limited STRs to one or two per neighborhood.

106.    Lastly, the amendments required an inspection upon the initial application as a matter of course. *Id* at 6 ("Staff will inspect the proposed short-term rental unit and property grounds to ensure that they meet property maintenance code standards."). As to renewals, the amendments stated that "[i]nspections will not be performed as a matter of course for renewal applications, but the City reserves the right to inspect the short-term rental unit and property grounds at any time for compliance with property maintenance code standards."

107.    Most importantly, the proposed ordinance placed "conditions precedent" on one's ability to engage in STR use, which precluded a prospective Host from being able to even apply for a permit without satisfying the following requirement: attorney certification, HOA's written approval, and neighbors' written consent.

108.    The first condition precedent required a Host to "[h]ave an attorney licensed to practice law in South Carolina certify to the City on a form provided by and returned directly to

the City by the attorney that a title search has been conducted *from the beginning of time* for recorded deed restrictions or restrictive covenants that apply to the subject property, and that if any exist, they allow a short-term rental use with *100% certainty*."

109.    Next, as to the HOA's approval, the proposed amendments stated that "the association president or other representative legally authorized to act on behalf of the association must provide a letter directly to the City stating that either the association *has approved the use or does not regulate it*."

110.    Lastly, the amendments required essentially half of a residential neighborhood to provide written consent as a condition precedent: "[i]f the short-term rental use is a special exception use in the subject zoning district, all property owners within a 500-foot radius of the subject property must indicate in writing on a form provided by the City that they are not opposed to the use."

111.    Proposed amendments sparked a spirited public debate and many members of the public attended the hearing, including some Guests. Notably, a Microsoft executive felt compelled to voice his discontent with the proposed regulations commenting "inspecting Airbnbs for working toilets - are you kidding me?" He further explained that he frequently visited Rock Hill on business and that he preferred to use Airbnb precisely because STRs are located in residential neighborhoods, as opposed to hotels, which makes it much safer and a lot more convenient, which is consistent with the Municipality's express finding.

112.    Upon receiving public comments, the Planning Commission proposed to modify most of the proposed amendments, commenting that they were "impossible to meet."

113.     Even though the planning Director stated that current Hosts were "grandfathered," the proposed amendments required all current Hosts to secure neighbors' consent and attorney certification in order to renew their permits.

114.     In response to the Planning Commission's concern with the Municipality's definition of "grandfathering," the Planning Director stated "yes, some of the current Hosts will not be able to continue, for sure."

115.     Prior to the City Council's public hearings, the Planning Director notified Hosts that no public commenting would be allowed at either the first reading or the second reading of the Amended Ordinance, contrary to the standard practice and applicable law.

## AMENDED ORDINANCE

116.     On December 12, 2022, the Municipality enacted the Amended Ordinance.

117.     At the beginning of the hearing Councilmember Black asked for an executive session to secure legal advice from the city attorney. Upon the Council's return, Councilmember Black made a motion to "fully grandfather" current Hosts and exempt them from having to obtain contiguous property owners' written consent in order to renew their permits, which was approved by a vote of 5-2 with Councilmembers Reno and K. Sutton dissenting.

118.     Councilmember Black expressed other concerns, indicating that he did not think it was "fair" to make a Host "chase all over the world" to secure the adjacent neighbors' consent, as some property owners may reside out of state or even abroad.

119.     This led Councilmember Pender to make another motion to allow silence from contiguous property owners in response to a certified letter from a Host requesting their approval to serve as their consent.

120.     The motion failed upon a vote of 2-5 with Mayor Gettys, Mayor Pro Tem Lindsay, Councilmembers Reno, K. Sutton, and P. Sutton voting against it. As such, the Amended Ordinance requires Neighbors' affirmative consent and failure to act is not sufficient.

121.     Councilmember K. Sutton's comments made it exceedingly clear that the Neighbors may not only decline to give their consent on a whim without having to come forward with any legitimate reason for their refusal, they may also simply ignore a Host's request to prevent them from being able to even apply for a permit.

122.     The Amended Ordinance gave the adjoining neighbors an arbitrary veto power that can be exercised on a whim, making it fatally defective. In passing the Ordinance, the Municipality exceeded its statutory authority under §6-29-760 by creating a new substantive right. SCGS §6-29-760 ("An owner of adjoining land or his representative has standing to bring an action contesting the ordinance or amendment; however, this subsection does not create any new substantive right in any party.")

123.     Despite the STR amendments, the Municipal Code continues to define "business" as "any business, calling, occupation, profession, or activity engaged in with the object of gain, benefit, or advantage, either directly or indirectly."

124.     The Amended Ordinance continues to define a Host as "the person offering a *residential* living unit, or portion thereof, for short-term rental."

125.     The purpose section of the Amended Ordinance remains the same and states that the regulations are intended to prevention "undue commercialization," and while the purpose itself is legitimate, it is not rationally conceivable that neighborhoods can be commercialized by Guests using properties "for overnight stay." Eliminating "residentially-used" from the Municipality's STR definition did not change the fact that the use is expressly defined as residential.

126.     The Amended Ordinance allows STRs only in the overlay district comprised predominantly of properties zoned for commercial use and a few residential properties in the downtown and riverwalk areas, which keeps Hosts out of upscale neighborhoods, such as Seventeen Acres.

127.     The overlay district precludes STRs in most residential neighborhoods, which is at odds with the Municipality's express findings in § 11-362 that "[c]ity council finds that there is a growing national interest for short-term accommodations *in traditional neighborhood settings* … [and] that the provision of such accommodations can be beneficial to the public if potential negative impacts are managed."

128.     Notably, the Municipality did not make a finding of any *existing* negative impacts, and the Ordinance refers only to "*potential* negative impacts." Moreover, the legislative history is exceedingly clear that there are no negative impacts on any of the residential communities.

129.     The overlay district is arbitrary, as noted by some members of the Planning Commission, who indicated that they "do not understand why the lines are drawn where they are" and that while "the requirements are different, the end result is still the same - as they said, they were going to get rid of some STRs."

130.     Next, the Amended Ordinance requires a Host to secure a written consent of all contiguous Neighbors, in addition to the HOA's approval, if their property is "zoned residentially and is either used residentially or is undeveloped." Apparently, the Municipality felt that STR use can be disruptive to an unoccupied piece of land.

131.     As some members of the Planning Commission noted, the neighbors' consent requirement will prevent most people from hosting their properties. Even the Planning Director

herself admitted that the requirement is nearly impossible to satisfy by noting "*potentially* those neighbors will give their support."

132.    Mr. Lee, who resides in Seventeen Acres, felt compelled to further explain that the Neighbors "will not give approval because *they don't want it there*."

133.    The Ordinance continues to (1) prohibit Hosts from allowing *any* parties and events, even if entirely undetachable from the outside and without any impact on the Neighbors' quiet enjoyment, (2) require Hosts to maintain a guest registry and a business license, and (3) require a property owner or their agent to live within a 15-mile radius of the city limits.

134.    In addition, the Amended Ordinance states that "the City reserves the right to inspect the short-term rental unit and property grounds at any time" without having to articulate any good cause or secure a municipal warrant.

135.    Lastly, Section 11-372 declared that "[s]hort-term rental permits do not run with the land," and requires "[p]rospective or subsequent property owners … to apply for a new short-term permit according to the processes and standards in place at the time of application," which is in direct conflict with § 6-29-1550, which states that a vested right "is not a personal right, but attaches to and runs with the applicable real property."

136.    The Planning Director explained that "rights do not run because those neighborhoods want this to end with current hosts."

## SELECTIVE ENFORCEMENT

137.    As a backdrop, while the City was in the process of amending its STR regulations in order to prevent "undue commercialization" of its residential neighborhoods, it was put on notice that one such neighborhood, Meadow Lakes II, was operating an event venue in violation of both the restrictive covenants prohibiting commercial activity and the zoning ordinance.

138.     The Municipality was also put on notice that the venue's operation gave rise to a public nuisance to the extent it was creating severe disruption of the residents' quiet enjoyment and bringing unsavory characters into the community, who trespassed on privately owned properties, while intoxicated, used foul language when asked to leave, and abused illicit drugs while using the club house.

139.     Moreover, the Municipality had actual notice that several residents made numerous noise and trespass complaints to the police, which refused to enforce the law because "HOAs are not subject to the municipal code" according to the police officers' superiors.

140.     When put on notice of the HOA's violation of the zoning ordinance, the Municipality not only neglected to enforce it against the HOA in an even-handed manner to prevent undue commercialization of this community, it indicated that it planned to amend the neutral municipal law to allow the HOAs to operate commercial venues in residential communities, making it exceedingly clear that its disparate treatment is purposeful in nature.

## COUNT ONE
### 42 U.S.C. § 1983 (Equal Protection)

141.     Plaintiff re-alleges the preceding paragraphs as if set forth fully herein.

142.     Plaintiff's First Claim for Relief is for deprivation of Equal Protection in violation of Civil Rights Act.

143.     Title 42 U.S.C. § 1983 provides a means for redress for the deprivation of federal constitutional and statutory rights by a person acting under color of state law. It states in part:

> Every person who, under color of statute, **ordinance**, regulation, custom, or usage of any state…subjects, or causes to be subjected, any …person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

144.     As an initial matter, Plaintiff is a "person within the jurisdiction" of the United States entitled to the protection under the Civil Rights Act.

145.     Municipality is a "person" to the extent the Defendant's liability is predicated on the adoption of an unconstitutional ordinance. *Berkley v. Common Council of City of Charleston*, 63 F.3d 295, 296 (4th Cir. 1995) (municipality is a "person" subject to suit under § 1983 if the allegedly unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers).

146.     In addition to being recurrent in nature, Defendant's actions were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's constitutional rights, warranting punitive damages to deter the City from engaging in similar conduct in the future. Deterrence is necessary in light of the repetitive nature of the misconduct.

147.     Defendant's actions directly and proximately caused Plaintiff to sustain both pecuniary and non-pecuniary intangible injury from the deprivations of civil rights, including severe mental anguish due to the City's persistent and repeated attempts to put Plaintiff and other Hosts out of business for the past five years.

148.     The Fourteenth Amendment's Equal Protection Clause states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). The Clause "requires that the states apply each law, within its scope, equally to persons similarly situated, and that any differences of application must be justified by the law's purpose." *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995).

149.     The Municipality violated the Equal Protection clause when (1) it explicitly classified people into Hosts and Neighbors and (2) when it purposefully failed to enforce a facially neutral municipal law evenhandedly favoring HOAs.

150.     Ordinance before this Honorable Court is bottomed on illegitimate animus towards Hosts and those perceived as the "outsiders." *See Village of Willowbrook v. Olech*, 528 U.S. 562, 566, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (Breyer, J., concurring) (noting that the distinguishing factor between "run-of-the-mill zoning cases [and] cases of constitutional right" is the presence of a factor demonstrating 'vindictive action,' 'illegitimate animus' or 'ill will.' "). It embodies elements of punitiveness and discrimination which violate the rights of Hosts to equal treatment under the law, to the extent the Ordinance classifies people into Hosts and Neighbors on its face and severely limits Hosts' property rights, i.e., Hosts' right to exclude others and have guests, while leaving the Neighbors' right to host overnight guests untouched.

151.     In drawing the distinction, the Municipality relied on unsubstantiated assumptions about groups of persons based on their status (Hosts and Unknown Guests versus Neighbors and HOAs) rather than their conduct (actually committing nuisance). *See Moreno* (the Equal Protection Clause abhors classifications undertaken for their own sake, i.e., classifications undertaken for the sake of excluding some from benefits but not others without some affirmative justification for doing so).

152.     There is no justifiable distinction in neighborhood impact that underlies the differential treatment. To the contrary, the legislative record is exceedingly clear that permitted STRs do not negatively impact the community, while Neighbors' known Guests and HOA's venue Guests cause substantial disruption of quiet enjoyment.

35

153.     The legislative history contains affirmative evidence of the Municipality's desire to harm a specific social group, Hosts, making it exceedingly clear that the Ordinance was amended because Neighbors "don't want" either Hosts or unknown Guests in their communities. Such bare desire to exclude with the goal of discrimination for the sake of discrimination is an impermissible function of the law. *See Moreno* at 534–35.

154.     The Municipality was driven by legislative ill will, plainly demonstrated by councilmembers' remarks that "STRs have always been prohibited" and that "no one wants to live next to a short-term rental."

155.     Primary function of this discriminatory Ordinance is to express and enforce distinctions between social classes, Hosts and Neighbors. The Ordinance is designed to punish a politically unpopular group, Hosts, whose ability to engage in the same residential in nature activity is severely limited, while Neighbors are permitted to host guests, have parties, and create congestion, "as this is something we all have to put up with," according to the Planning Director.

156.     Commitment of Equal Protection to fundamental anticaste orientation applies with equal concern to all discrimination against social groups, regardless of whether they have been recognized as suspect classifications. The Supreme Court is willing to find that a law violates the Equal Protection Clause where statements surrounding the enactment of the law indicate that it was motivated by private bias against an unpopular group. Such evidence is in ample supply here, where opponents of STRs created a lengthy record of anti-STRs, anti-Hosts, and anti-Guests sentiment.

157.     The Ordinance is designed for mere private gain as distinguished from the good of the common welfare. It gives effect to the Neighbors' entirely irrational fear and private biases, as well as their moral disapproval of hosting strangers in exchange for money, as evidenced by their

comments that unless the City intervenes, "nine out of ten houses on their street may soon be STRs," and that they want "known, pleasant, and the same" people next door.

158.    In passing the Ordinance, the Municipality attempts to protect the Neighbors from mere inconveniences of modern life, to the extent that their complaints are limited to "headlights shining in their windows" and "guests slamming their trunks."

159.    The City's express purpose to prevent undue commercialization is not conceivable, in light of the fact that the use to which the property is put is residential in nature, per the City's own definition.

160.    The presence of animus poisons the well, prompting a more vigorous examination of the additional state interest in abating potential nuisances, such as noise, litter, congestion, and building code violations, involving properties used as STRs, as mere pretext for unconstitutional discrimination.

161.    A Host-Neighbor classification is not affirmatively related to the accomplishment of those interests, as Neighbors' *known* guests typically cause more noise, litter, and congestion, and Neighbors' properties are far more likely to have building code violations, because hosting is a self-regulating industry.

162.    The difference in treatment between Hosts and Neighbors is not justified because (1) the use to which property is put, which is overnight stay, is the same irrespective of who is hosting, Neighbors or Hosts, (2) neither payment of money nor use of hosting platforms transforms the use to which property is put into a commercial activity, (3) the argument that STRs is a commercial activity because the City requires a business license is a fatally flawed circular argument, (4) residential in nature activity cannot possibly lead to commercialization of a residential community, let alone undue commercialization, (5) hosting overnight guests, has the

same impact on the community irrespective of who is engaging in the activity, (6) unlike STRs, Neighbors' hosting oftentimes negatively impacts the community because Hosts are held to a higher standard by hosting platforms and the City, (7) generally applicable law, such as the City's noise ordinance, is plainly sufficient to remedy any violations of Neighbors' quiet enjoyment, and (8) there are no nuisance-like issues involving Hosts and Neighbors are not disturbed in their quiet enjoyment.

163.    The overlay district is at odds with the City's express factual findings that the public is particularly interested in STR accommodations in traditional neighborhoods and that provision of such accommodations benefits the community in a variety of ways.

164.    Even a cursory examination reveals that the amendments do not further the purported state interests in abating potential nuisances, because according to the legislative history, (1) there are no nuisances caused by STRs and (2) a hand-full of legitimate issues mentioned by the opponents of STRs are caused by unpermitted STRs and long-term rentals. *See Euclid v. Ambler Realty Co.*, 272 U.S. 365, 394–95, 47 S. Ct. 114, 71 L. Ed. 303 (1926) (Kennedy, J., concurring) (the failure of a regulation to accomplish a stated or obvious objective is relevant to the inquiry).

165.    Many of the purported interests identified by opponents of STRs are nothing more than unarticulated dislike of the outsiders as well as hosting strangers in general.

166.    In the absence of a rational basis, what remains of the Municipality's case is an inference, amply supported by evidence in the record, that the Amended Ordinance was premised on the belief that hosting strangers in return for money is simply not as good as hosting friends, acquaintances, and family members in exchange for consideration other than money. Such moral superiority offends the Equal Protection Clause.

167.     The City also engaged in selective enforcement of its facially neutral law, exhibiting animus towards Hosts and favoritism towards HOAs and Neighbors, as demonstrated by the City's intentional refusal to enforce its generally applicable zoning and noise ordinances against MLII HOA, despite the fact that an event venue is a purely commercial activity unquestionably likely to cause undue commercialization and disruption of traditional residential communities.

168.     Moreover, the Municipality manifested intent to amend its facially neutral zoning laws to expressly allow HOAs to operate commercial venues within residential communities, making it exceedingly clear that the HOAs run by men of standing in the Rock Hill community are to be treated differently, further expressing and enforcing distinctions between social classes.

169.     The City's actions in keeping residential hosting out of residential communities, while inviting and legalizing commercial event venues in the same communities, constitute an illegal spot zoning, plainly inconsistent with the Municipality's stated goal of protecting residential neighborhoods "where people actually live" from undue commercialization.

170.     Strict scrutiny applies to the case at hand because the controversy involves fundamental rights and liberties, i.e. Hosts' property and privacy rights, their First Amendment freedom of ideas and liberty to associate with strangers, and their Fourth Amendment right to be free from unreasonable governmental intrusion into their privately owned homes.

171.     The Municipality is unable to meet its burden of showing that the Ordinance is narrowly tailored to promote a compelling government interest because (1) it is overbroad, as will be discussed below, and (2) not rationally related to the government's legitimate interest of preventing undue commercialization.

172.  The Ordinance at hand will not survive even the most deferential level of scrutiny under the Equal Protection Clause because it is motivated by animus. *See Romer v. Evans*, 517 U.S. 620 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); *Palmore v. Sidoti*, 466 U.S. 429 (1984); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973). *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 1002 (N.D. Cal. 2010).

## COUNT TWO
### 42 U.S.C. §1983 (Due Process)

173.  Plaintiff re-alleges the preceding paragraphs as if set forth fully herein.

174.  Due Process Clause of the Fourteenth Amendment prohibits deprivation of life, liberty, or property without Due Process of Law. U.S. Const. amend. XIV.

175.  **§**1983 provides a remedy for violation of Due Process. There are three kinds of §1983 claims that may be brought against the Municipality under the Due Process Clause of the Fourteenth Amendment. First, the Clause incorporates many of the specific protections defined in the Bill of Rights. A plaintiff may bring suit under § 1983 for state officials' violation of his rights to, e.g., freedom of speech or freedom from unreasonable searches and seizures. Second, the Due Process Clause contains a substantive component that bars certain arbitrary and unreasonable government actions regardless of the fairness of the procedures used to implement them. Third, the Due Process Clause contains a procedural component which safeguards fairness of the procedure, including notice, opportunity to be heard, and a neutral decision maker. The City's actions gave rise to all three types of §1983 Due Process deprivation claims.

176.  As an initial matter, Plaintiff possesses cognizable property interest in STRs under state law, both statutory and common law. First, Plaintiff possesses a constitutionally protected property right by virtue of his title to the properties, because the right to have Guests is a necessary counterpart of the right to exclude others, which is regarded as the most important right "in the

bundle of sticks" held by every property owner. Next, Plaintiff possesses a vested interest in hosting under both South Carolina common law and the Vested Rights Act by virtue of his nonconforming use that predated the enactment of the original Ordinance. Lastly, Plaintiff has a cognizable property interest in his STR permits themselves.

**First and Fourth Amendment Liberty**

177.     The Ordinance deprives Hosts of liberties rooted in the First Amendment freedom of expression and association, by limiting their ability to host strangers. The legislative record shows that the opponents of STRs abhor the idea of being paid for hosting strangers and view having known guests in exchange for affection as morally superior, and that the Ordinance was motivated by the Municipality's impermissible desire to suppress the message conveyed by hosting and minority viewpoints.

178.     STRs may also be viewed as a commercial speech expressing an idea of hosting strangers in exchange for money. The Ordinance is a content-based regulation of such speech, to the extent it singles out STRs and discriminates among similar events and speakers because of the City's disagreement with the message conveyed, in violation of the Constitution's core anti-censorship principle, triggering strict scrutiny.

179.     The Ordinance is not narrowly tailored to promote a compelling government interest. To the contrary, it is overbroad and it burdens substantially more speech than is necessary to further the government's legitimate interests, as discussed below. Moreover, the regulations are not rationally related to any legitimate government interest, but instead bottomed on the Municipality's animus toward the ideas contained in the regulated speech.

180.    The Ordinance does not leave reasonable alternative avenues of communication, as by its express terms, it is designed to eventually eliminate STRs from essentially all traditional neighborhoods, as admitted by the Planning Director.

181.    In its desire to suppress ideas communicated by Hosts, the Municipality acted contrary to its express goal of protecting the character of traditional neighborhoods, when it allowed HOAs to operate venues in residential communities simply because they are operated by HOAs as opposed to a politically unpopular group, Hosts. Freedom of expression, and its intersection with the guarantee of Equal Protection, would rest on a soft foundation if the government could distinguish among people who hosts overnight guests on such a wholesale and categorical basis.

182.    Moreover, while the Ordinance states that its purpose and intent is to regulate "potential negative impacts" on the neighborhoods, it regulates hosting of overnight guests itself, not its potential secondary effects, which are adequately regulated by restrictive covenants and generally applicable municipal law, as evidenced by the lack of violations involving STRs.

183.    Policing Hosts' overnight Guests and requiring Hosts to keep guest registries infringes on Hosts' and Guests' fundamental right to privacy, which protects both the identity of one's Guests and what consenting adults do behind closed doors inside privately owned residential property without any nuisance-like impacts on the adjoining properties. STR activity, which takes place entirely inside Hosts' privately owned properties, is outside the government's legitimate reach.

184.    Next, the Ordinance deprives Hosts of liberties rooted in the Fourth Amendment by subjecting them to inspections without a municipal warrant, reasonable cause, or even an articulable suspicion that an unsafe, unsanitary, or otherwise hazardous or unlawful condition

exists on the Host's property, in violation of the prohibition on unreasonable searches. Requiring Hosts to keep a guest registry also constitutes an unreasonable search in violation of the Fourth Amendment.

**Substantive Due Process**

185.     The Ordinance deprives Hosts of their Substantive Due Process to the extent that residential in nature use cannot conceivably lead to commercialization, let alone undue commercialization. *See Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 827 (4th Cir.1995) (In order to successfully assault a city's zoning decision, it must be clear that the state's action "has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.").

186.     What is actually causing undue commercialization is the Municipality's own spot zoning pursuant to its policy of favoring HOAs.

187.     The City's actions in banning STRs from residential communities while allowing neighborhood club houses to be used as commercial venues are nothing but irrational exercise of its police power. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L.Ed.2d 1043 (1998) (stating that the Due Process Clause is intended in part to protect the individual against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective"); *see also City of Orangeburg v. Farmer*, 181 S.C. 143, 186 S.E. 783, 785 (1936) (striking down an ordinance prohibiting door-to-door sales calls as unconstitutional based on a finding that the ordinance failed to further the public health, safety, or welfare and was therefore unreasonable).

188.     Contrary to its duty to promote general welfare, the Ordinance adversely affects the public good, to the extent it denies the public essentially all of the benefits expressly referenced in the municipal code. Specifically, the overlay district is inharmonious with the City Council's own expressly stated purposes and intent to accommodate the travelling public's growing interest in residential alternatives to hotels.

189.     Contrary to the Municipality's stated purpose of managing potential negative impacts, the Ordinance is not designed to *regulate* STRs; it is designed to eliminate STRs from essentially all traditional neighborhoods, as evidenced by the Planning Director's admission that "they want it to end with current hosts." *See Annex Books, Inc. v. City of Indianapolis, Ind*., 740 F.3d 1136, 1137 (7th Cir. 2014) ("[A]dults may decide for themselves what risks to run by the literature they choose, and cities must protect readers from robbers rather than reduce risks by closing bookstores.")

### Procedural Due Process

190.     The Ordinance was tainted with fundamental procedural irregularity and a significant departure from normal procedures involved in amending municipal law.

191.     In abusing its moratorium power, the Municipality unlawfully interfered with Hosts' protected liberty and property interests by failing to provide adequate procedural safeguards, such as notice and opportunity to comment, as required by both federal and state law.

192.     The City acted illegally and outside of its legislative power when it suspended the 2020 STR Ordinance by enacting a moratorium on STRs effective immediately, contrary to the procedure outlined in SCGS §6-1-110. *See James v. Benjamin*, No. 3:17-491-MBS-PJG, 2019 U.S. Dist. LEXIS 228971, at *20 (D.S.C. Dec. 10, 2019) ("Defendants' failure and refusal to comply with its own carefully crafted and adopted Comprehensive Plan, and South Carolina law regarding

its own procedures constitutes an invalid exercise of Defendants' police powers and an abuse of power under color of law.").

193.    The City exceeded the scope of its police power by enacting regulations which are contrary to the public welfare. The Ordinance benefits private interests, gives effect to unilateral expectations, and promotes abstract desires of a few members of the community, who are merely inconvenienced by Guests' headlights and trunks, which the law views as a "part of the modern environment of life," at the expense of Hosts' constitutional rights, vested property rights, and investment backed expectations.

194.    Procedural Due Process was also violated by the Municipality's repeated failure to observe its form of government, as reflected in state and local statutes, which prohibits the City Council from giving direct orders to the Planning Director who is subject to the direction and supervision of the manager, based on ethical considerations and fundamental principle of separation of powers.

195.    The amendments were motivated by the Municipality's dissatisfaction with the ZBA's approval process, and constituted an unconstitutional attempt to usurp its quasi-judicial power.

196.    The Amended Ordinance deprives Hosts of Procedural Due Process to the extent the Municipality delegated its decision-making authority to Neighbors by creating and vesting them with a new substantive right to veto hosting on a whim, exceeding its power to delegate. Moreover, such unfettered discretion is offensive to the Due Process Clause.

197.    Similarly, the Amended Ordinance deprives Hosts of Procedural Due Process as the Municipality delegated its decision-making authority to the HOAs by creating and vesting them with a new substantive right to regulate hosting irrespective of the restrictive covenants.

45

198.     The Amended Ordinance gave the Planning Director unfettered discretion to refuse to approve new permit applications or to renew Host's other permits in the even one of Host's permits is revoked, and in addition pursue Host's business license revocation, which would disqualify a Host from engaging in STR use, without setting forth any objective standards to guide the Municipality.

199.     At the same time, the Amended Ordinance illegally abrogated Hosts' vested rights without due process of law by declaring that "[s]hort-term rental permits do not run with the land," contrary to SCGS §6-29-1550, which states that a vested right attaches to real property, in order to please certain residents of Seventeen Acres who "want it to end with the current Hosts."

200.     The Amended Ordinance is at odds with the Due Process clause to the extent it contains impermissibly vague provisions. For instance, the three strikes rule, permits the Municipality to revoke a permit based on "three valid neighbor complaints or police calls" or a single event with "widespread community impacts," without defining what constitutes a "valid" complaint or a "widespread community impact."

201.     Lastly, both the 2020 STR Ordinance and Amended Ordinance are constitutionally infirm to the extent that they are overbroad in violation of the Due Process Clause.

202.     First, the Amended Ordinance defines a Host as "the person offering a *residential* living unit, or portion thereof, for short-term rental." It also states that a "Short-term rental means the rental of a property with five or fewer bedrooms in whole or in part *for an overnight stay* of less than 30 days at a time to one or more guest parties."

203.     Notably, neither monetary consideration nor use of hosting platforms is required in order for having overnight guests to constitute a STR and to be subject to the Ordinance.

204.     Second, the Ordinance requires Hosts to obtain and maintain a business license. The municipal code defines "business" as "any business, calling, occupation, profession, or *activity engaged in with the object of gain, benefit, or advantage, either directly or indirectly*. (Ord. No. 2021-45 , § 3(Exh. A), 6-28-2021).

205.     The ironic result is that the Ordinance sweeps so broadly that it encompasses not only STRs, but also hosting friends and family, in exchange for affection, companionship, returned favors, etc., engaged into by Neighbors.

206.     Applied in accordance with its express terms, the Ordinance requires everyone including Neighbors to secure a permit before they can have a friend over for a few nights, and all adjoining landowners written permission, before they can even apply for a permit. Everyone including Neighbors are also required to maintain a business license and a guest registry, as hosting a friend or a relative is an "activity engaged in with the object of gain, benefit, or advantage, either directly or indirectly." Lastly, anyone who has overnight guests, including Neighbors, are subject to an inspection at any time without any notice or reasonable cause.

## COUNT THREE
### 42 U.S.C. §1983 (Dormant Commerce Clause)

207.     Plaintiff re-alleges the preceding paragraphs as if set forth fully herein.

208.     Suits for violation of the Commerce Clause may properly be brought under 42 U.S.C. §1983.

209.     As a preliminary matter, Plaintiff has standing to assert a Dormant Clause deprivation as Plaintiff and other Hosts were specifically targeted precisely because the Municipality knew that STR Hosts were willing to contract and do business with out-of-staters, whom the opponents of STRs wanted to keep out of there residential neighborhoods.

210.     The Hosts are harmed because the Ordinance promotes and gives effect to the Municipality' illegitimate animus toward the outsiders. *See Scott v. Greenville County*, 716 F.2d 1409 (4th Cir. 1983) (businessman had standing where "injured because defendants believed he was willing to contract and do business with members of minority groups).

211.     Moreover, Plaintiff has a third-party standing to assert travelling Guests' rights to the extent that Plaintiff is a real party in interest, Plaintiff himself sustained a concrete injury traceable to the City's enactment of the STR regulations, which would be redressed because a favorable outcome of this litigation would repeal the "burdens on purchasing of plaintiff's goods," Plaintiff has a close relationship with travelling Guests as well as a cognizable expectancy in prospective advantage stemming from such relationship, and Plaintiff is in a better position to assert the claim on behalf of out-of-state Guests. *See Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020) (vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function).

212.     Plaintiff also has standing to assert the rights of Prospective Hosts, whose investment backed expectations were frustrated by the regulations, pursuant to the public importance doctrine because the issues raised by Plaintiff transcend a purely private matter and rise to the level of public importance, and the resolution of these issues is necessary for future guidance. The matter of importance in the context of this case is inextricably connected to the public need for Court resolution for future guidance.

213.     The Constitution grants Congress the power "[t]o regulate Commerce ... among the several States." Art. I, § 8, cl. 3. The Supreme Court has interpreted the Commerce Clause as also having a negative implication, often called the "Dormant Commerce Clause": states generally

cannot pass protectionist measures that favor in-state actors over out-of-state actors. *See, e.g., Sandlands C&D LLC v. Horry*, 737 F.3d 45 (4th Cir. 2013). The Supreme Court has also used the Dormant Commerce Clause to invalidate locally protectionist measures that target all outsiders, not just those from other states. *Id*.

214.     There are two primary principles that mark the boundaries of a State's authority to regulate interstate commerce. First, state or local regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce.

215.     STRs constitute "interstate commerce" to the extent they involve a "commercial intercourse" between in-state Hosts and out-of-state Guests. *See South Dakota v. Wayfair, Inc*., 138 S. Ct. 2080, 201 L.Ed.2d 403 (2018) ("commerce included both the interchange of commodities and commercial intercourse").

216.     The Ordinance at hand discriminates against out-of-state Guests in its practical effect, and favors in-state renters, which makes it *per se* invalid under the Dormant Commerce Clause. *McBurney v. Young*, 667 F.3d 454, 468 (4th Cir. 2012) (statute will almost always violate the Dormant Commerce Clause if it "discriminates facially, in its practical effect, or in its purpose).

217.     Moreover, the Ordinance discriminates against out-of-state investors in its principal effect and its purpose, to the extent it is designed to prevent out-of-state investors from purchasing properties in traditional neighborhoods for the purpose of using such properties as STRs.

218.     It is a protectionist measure that target all outsiders, not just those from other states, with the goal of keeping those perceived as "outsiders" out of Rock Hill's traditional residential communities.

219.     By virtue of its terms, the ordinance applies only to certain Guests, whom the opponents of STRs refer to as "short-term people" characterized as "unknown" and "problematic," and targets them for disparate treatment.

220.     The purpose section of the Ordinance acknowledges that STRs are primarily and predominantly used by travelling out-of-state public, who are particularly interested in staying in traditional neighborhoods as opposed to hotels.

221.     The City singles out out-of-state travelling Guests, who book properties on a short-term basis, and limits their access to most residential neighborhoods, while clearly favoring in-state "known" residents who rent on a long-term basis, because long-term renters are by definition in-state residents, and hence not "outsiders."

222.     The legislative record and statements surrounding the enactment of STR regulations show that the Ordinance was motivated by illegitimate animus, manifesting itself as private biases against "unknown" out-of-state Guests as well as out-of-state Hosts. The opponents of STRs created a lengthy record of anti-Guest sentiment and unarticulated dislike of those perceived as outsiders simply because they are strangers to the Rock Hill community.

223.     The Ordinance gives effect to the Neighbors' entirely irrational fear and private biases towards the outsiders, i.e., out-of-state Guests and Hosts, as well as Neighbors' and long-term tenants moral superiority over "short-term people," as evidenced by their comments that they "don't know who else is coming" and that they want "known, pleasant, and the same person next door."

224.     This protectionist measure cannot conceivably prevent undue commercialization, as STR use is residential in nature, and there are certainly more suitable alternatives available to the City Council to accomplish the Municipality's goal of protecting residential character of its

traditional neighborhoods. The Municipality can accomplish this purpose by simply enforcing its existing zoning ordinance even-handedly against local HOAs, which operate commercial "party houses" within residentially zoned traditional neighborhoods.

225.　　The Ordinance unduly burdens interstate commerce because the burden created clearly outweighs its benefits to the public, if any, which would justify such heavy-handed regulations.

226.　　Elimination of STRs from most residential neighborhoods precludes the local benefits expressly recognized and acknowledged by the City, such as "assisting property owners with keeping properties in good order and repair, which in turn, assists in stabilizing home ownership, and maintaining property values in neighborhoods."

227.　　The undue nature of the burden is made even more apparent because the Ordinance is designed to eventually eliminate *all* STRs from traditional neighborhoods by turning vested property rights into personal rights, to give effect to the Neighbors' desire "to end [STRs] with current Hosts."

228.　　Likewise, the Ordinance runs contrary to the City's express finding that STRs "also serve to bolster the City's sports tourism industry by providing alternatives to traditional hotels and motels for the traveling public," sacrificing this local benefit by limiting STRs to the overlay district.

## COUNT FOUR
### Declaratory Judgment (28 U.S.C. § 2201)

229.　　Plaintiff re-alleges the preceding paragraphs as if set forth fully herein.

230.　　Under the Declaratory Judgment Act, in "a case of actual controversy within its jurisdiction," a court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

231.     Actual justiciable controversy exists in the case at bar. The City has enacted an ordinance eliminating STRs from most traditional neighborhoods and severely limiting expansion of STR use, zoning away Hosts' and Guests' constitutional rights. Plaintiff, a city resident, operates several STRs and relies on them as a source of his family's livelihood. Plaintiff's hosting plans as well as his constitutional rights are directly affected by the Ordinance at issue. Plaintiff is challenging the validity of the Ordinance on statutory and constitutional grounds. The controversy is real and substantial; it is not contingent, abstract, or hypothetical. The validity of the Ordinance and the parties' rights under it as they presently exist will be resolved by the Court's decision.

232.     This Honorable Court has subject matter to hear the controversy and Plaintiff's claims are uniquely suited for the federal forum, because, by reason of prejudice, passion, neglect, intolerance, or otherwise, state laws might not be enforced and Plaintiff's claims to enjoyment of rights, privileges, and immunities guaranteed by Fourteenth Amendment might be denied by state agencies.

233.     The controversy is ripe for judicial review and considerations of practicality and wise judicial administration weigh in favor of exercising the Court's jurisdiction to declare Plaintiff's and other Hosts' rights in connection with the Ordinance, as issues raised by Plaintiff are of public importance.

234.     Plaintiff is seeking Declaratory Judgment that (1) hosting is not a rental activity but a mere license, (2) hosting is a residential activity, (3) STRs do not constitute a commercial activity, (4) Ordinance violates Equal Protection Clause to the extent it is motivated by animus, (5) Ordinance at hand is arbitrary and irrational in violation of Substantive Due Process, (6) Ordinance is unconstitutionally vague and overbroad in violation of Procedural Due Process, (7) Ordinance violates Plaintiff's First Amendment freedom of expression, ideas, and association, (8)

Ordinance violates Plaintiff's Fourth Amendment rights against unreasonable search, (9) Ordinance violates Plaintiff's fundamental right to privacy, (10) Ordinance violates Dormant Commerce Clause, and (11) partially preempted by SCGS § 6-29-1550, based on its supremacy.

**COUNT FIVE**
**Tortious Interference with Contract and Prospective Advantage**

235.     Plaintiff re-alleges the preceding paragraphs as if set forth fully herein.

236.     The Municipality's actions also gave rise to a state law claim for tortious interference with contract and prospective advantage.

237.     STRs are a creature of contract law, to the extent Hosts agree to have an overnight Guest in exchange for consideration. Plaintiff and similarly situated Hosts had contracts with Guests, when the City first attempted to regulate STRs in 2017. Moreover, Plaintiff and Hosts, including prospective Hosts who invested in STRs prior to the passage of the moratorium, have a valid business expectancy in prospective contractual relations with Guests and a reasonable expectation of realizing a substantial economic advantage as a result of such contracts.

238.     Plaintiff had a commercially reasonable expectation of expanding his STR operations and realizing substantial economic advantage as a result.

239.     The Municipality knew that such contracts existed as evidenced by its statement that "the regulations go into effect immediately but that enforcement not be taken until August 1, 2017, against hosts who can show *documentation of bookings* that were made prior to the adoption of the regulations for stays prior to August 1st" as well as Mayor Gettys' statement that the moratorium was designed to "protect" prospective Hosts from financial loss.

240.     In enacting the amended requirements, which were nearly impossible to meet, the Municipality acted intentionally and its design was to get rid of some STRs and prevent Hosts from using additional properties in traditional neighborhoods as STRs. Moreover, the Ordinance

is deliberately calculated to eliminate STRs from certain traditional neighborhoods over time because the Neighbors "don't want it there."

241.     By enacting an unconstitutional ordinance, the Municipality used improper methods, including but not limited to abusing its moratorium power. In addition, the Municipality abused its legislative power for an improper purpose of promoting private biases.

242.     The Municipality's actions were tortious to the extent it violated Plaintiff's and other Hosts' constitutional rights, vested property rights, and investment backed expectations.

243.     The Ordinance had direct impact on Plaintiff's STR operations, to the extent it prevented their expansion. Moreover, the Ordinance had a direct impact on out-of-state Guests, to the extent it limited STRs to the overlay district, frustrating Guests' known preference to stay in traditional neighborhoods, which in turn will decrease the number of out-of-state Guests, causing Plaintiff and other Hosts to sustain loss of business opportunities.

244.     But for the City's interference, Plaintiff and prospective Hosts would have realized a substantial economic advantage.

245.     The regulations caused substantial pecuniary harm to Plaintiff and other Hosts, including prospective Hosts who invested in STRs before the City enacted a moratorium.

**WHEREFORE**, Plaintiff prays for judgment against Defendant City of Rock Hill, awarding actual compensatory damages as well as punitive damages to deter wanton conduct, declaratory relief that the Ordinance is unconstitutional, equitable relief permanently enjoining the City from enforcing its STR regulations, litigation costs, attorney's fees pursuant to 42 USCS § 1988, and any other relief the Court deems just and proper.

Respectfully submitted on March 8, 2023.

__/s/ *Ina Shtukar* _
Ina Shtukar, Esq.

54

Black & White Law
Attorney for Plaintiff
Federal ID: 13947
1687 Saybrook Court
Rock Hill, SC 29732
(704)-309-0993 and (704)-309-0992
ina@blackandwhiteimmigrationlaw.org